[Filed January 15, 1889.]

## LUCY A. ADAMS, Appellant, v. CALVIN H. ADAMS and WILLIAM ADAMS, Respondents.

Statute of Frauds — Agreement — Part Performance of — What is. — The marriage alone of parties is not such a partial performance of an agreement made between them regarding pecuniary rights as will be sufficient to take it out of the operation of the statute, which requires such agreements to be in writing.

Contract — Specific Performance of Marriage Settlement. — A court of equity will not decree a specific performance of an oral agreement to make a marriage settlement, unless the party to be charged has given countenance to the doing of acts by the adverse party, upon the faith of the agreement, of such a nature that the latter would be materially injured if the agreement were not carried out. In such a case, the court, in order to avoid a fraudulent use being made of the statute, will enforce a specific performance of the agreement.

Marriage Contract — Inducements to Make Representations concern-
ing Property. — Where W. A., in proposing marriage with L. A., held
out inducements that he was able to support her; that he expected to keep
control of certain premises owned by him during his lifetime, and have
them for a home, and that she should share them with him, and in case
she survived him, should have the use and control of them during her life-
time, and after their marriage the parties occupied the premises as a home,
the said W. A. assuring the said L. A. that it was their home: held, that
the facts did not prove an agreement upon the part of W. A. to give to
L. A. the use of the property for her home during her life, in considera-
tion of her marrying W. A.; that such an agreement, if not in writing in
some form, would be void by the statute of frauds, and that the said facts
did not show a sufficient partial performance of the agreement to take it
out of the operation of the statute.

Id. — Costs of Litigation — Discretion of Court over in Equity Cases.
— Held, further, W. A. having, in about two years from the time of the
marriage, sold the premises to his brother, C. H. A., evidently for the pur-
pose of ejecting L. A. therefrom, that L. A. had no standing in court to
impeach the transaction as fraudulent in a suit to enforce a specific per-
formance of the alleged agreement; but the court, having authority to
direct as to the payment of costs in suits, will, where the conduct of a
party has been shown to be unjust and oppressive, require him to pay the
costs of the litigation.

Appeal from the Circuit Court for the county of Marion.

*George H. Burnett*, for Appellant.

*Seth R. Hammer* and *W. M. Kaiser*, for Respondents.

Thayer, C. J. — This appeal is from a decree of the
said circuit court in a suit in which the appellant was
plaintiff and the respondents were defendants. The liti-
gation originated out of an action at law brought in said
circuit court by the respondent Calvin H. Adams against
the appellant, to recover the possession of lot 2, in block
19, in the city of Salem. After the action was commenced,
the appellant, conceiving that she had no legal defense
thereto, but that she was entitled to relief arising out of
facts requiring the interposition of a court of equity, filed
a cross-complaint against the respondents, in which she
alleged, in substance, that the respondents were brothers;

that about June 1, 1884, the respondent William Adams, being then the owner of the premises in dispute, entered into an agreement with appellant to give her the use of the property for her home during her life, in consideration of her marrying him; that she did marry him, and with his consent entered into possession of the property under the agreement, and remained there; that about two years afterwards, for the purposes of defrauding appellant, William Adams made a deed of the property to his brother, said Calvin H. Adams, without appellant's knowledge or consent; that said Calvin took the deed with full knowledge of William's fraudulent purposes, and of appellant's rights in and to the possession of the property, with intent to aid said William in perpetrating the fraud on appellant, and without having paid any consideration for the property; and that respondents' doings, and the claims of said Calvin of ownership of the property, and that he is entitled to the immediate possession thereof, constitute a cloud upon appellant's right in said property and of her possession thereof; and wherein she prayed that the said respondents be perpetually enjoined from claiming or asserting any estate or interest in the property adverse to appellant's use of the same during her life, and from disturbing her possession thereof. The respondents, after interposing a demurrer, which was overruled by the court, filed an answer denying all the material allegations of the complaint. The case was thereafter heard upon depositions and proofs, and the said court decreed that the said complaint be dismissed, which is the decree appealed from.

It appears from the evidence that the appellant and the said William Adams intermarried in this state on the first day of June, 1884; that at the time of their marriage she was above fifty-two years of age, and that he was more than sixty-two years old; that she had had a former husband, and he a former wife; that they had a slight

acquaintance in Illinois while they were single persons, but did not see each other again until they met in Oregon, a short time before their marriage. Their object in forming the relation was evidently a purely selfish one; that is apparent from the account of their courtship, although it is glossed over with sentimentality. She doubtless fancied that she would thereby secure a home and the ordinary comforts of life; while he confidently imagined that she would be a great assistance to him in enabling him to prosecute the many vagaries which seem to have occupied his attention.

He says in his testimony: "I thought she was capable of being a very useful woman, an ornament and blessing to society, and that her taste and ingenuity would indeed make me, with my own efforts, a beautiful home."

She says in her testimony: "At our first interview in Portland, he told me that he had sold his property at Hillsborough, and had bought the property here in Salem; that, through the request of his former wife, he had willed the property to the Bible Society, but he expected to keep control of it during his lifetime, and if he ever married again, he expected to have it for a home, and his wife would share it with him, and if she survived him, she should have the use of it and control of it during her lifetime. In our next interview, he made a proposition of marriage, and wanted I should make him a beautiful home, as his former wife had done, and repeated again that he expected that we should have it for a home, and repeated again that I should have it for a home in case I outlived him, only far more strongly than on the former occasion, and laid a great deal of stress on 'making us a beautiful home.' . . . . I complained of being prematurely broken, and he said he was abundantly able to support me; that his brother owed him some, — I forget the amount, — and some others; and he had a standing offer of sixty dollars a month, be-

sides a good standing in three of the learned professions; and that he had an invention, that if he were successful in he believed it would make us wealthy."

The appellant should not have been deceived by such assurances; for she ought to have known that a man of the age of the said respondent, who claimed to have a good standing in three of the learned professions, who was then trying to succeed in an invention, and had nothing but an ordinary house and lot in Salem, which he had willed to the Bible Society, as evidence of his thrift, would not be able to support a wife nor furnish her a comfortable home. It is apparent, however, that she was deceived, and married him under a delusion. And the evidence shows quite conclusively that the sale of the house and lot by William Adams to the respondent Calvin H. Adams was a mere pretext and device to dispossess the appellant thereof.

It appears from the evidence that William wrote a letter to Calvin H., as follows: —

"SALEM, OREGON, Aug. 11, 1886.
"CALVIN H. ADAMS, Hillsborough, Oregon.

"*My dear Brother,* — Being anxious about what I owe you, and feeling the uncertainty of life and strength in my old age, I propose, if you can send me three dollars by money order or registered letter, for and in consideration of the same to give you a warranty deed of my home, numbered 191 High Street, and my lot, No. 2, in block 19, both in the city of Salem, Marion County, Oregon.          Affectionately your brother,
"WILLIAM ADAMS."

Said William was asked, when on the stand as witness in the case, the following questions, to which he gave the following answers: —

"What was the three dollars for that you mention in

that letter ?　A.　As the necessary consideration to insure its validity.

"Was it not for the purpose of making and recording the deed?　A.　It was not.

"How much did you owe your brother at that time?　A.　Well, summing up from the time I had owed him, counting interest, I estimated at one thousand dollars.

"Was it for borrowed money? if so, how much?　A.　Some two hundred dollars of borrowed money.

"When did you borrow it?　A.　Some of it as long ago as 1847 or 1848, when I was attending medical college.

"What else did you owe him for?　A.　For assistance in coming to this country, in 1852.

"How much did that amount to?　A.　About $150 or more, with interest.

"Did you intend this deed as a revocation of the will that you made to the Bible Society?　A.　Of course, if I put it out of my power, it would revoke it.

"Did your brother ever make any demand on you for the payment of this money that you claim to owe him?　A.　We had talked of it, and he had claimed it, and I had admitted his claim.

"When was this?　A.　The first when we arrived in this country, in 1852.

"When did you deliver the deed to your brother?　A.　I delivered it to his agent soon after it was made.

"Who was his agent?　A.　Seth R. Hammer.

"Did you not consult Mr. Hammer about this business, — about conveying this property to your brother? and did you not arrange with him to act as your brother's agent in the matter?　A.　I recommended him to my brother as a proper person to act as his agent.

"Is it not a fact that the only communication your brother had with Mr. Hammer on the subject up to the time of the execution of the deed was had through you,

and you acted as your brother's agent in getting Mr. Hammer to attend to the matter? A. I think it is not.

"Did you interview Mr. Hammer on the subject in the absence of your brother? A. I did.

"Did you do all this without consulting your brother? A. Yes.

"Did you make the deed before you received an answer to your letter of August 11, 1886, addressed to your brother? A. I did not."

The witness further stated that his brother knew that witness was having trouble with his wife at the time the deed was made, and that the appellant claimed the premises as her home.

This evidence shows conclusively to my mind that the transaction of the conveyance of the lot from William Adams to Calvin H. was a mere subterfuge, and that it was done in order to eject the appellant from the premises. The whole affair was evidently a scheme of cunning and hypocrisy, invented for the purpose of ousting the appellant from the home which it was clearly understood she was to have and enjoy during her lifetime, — the house on the premises where she was taken after the marriage, and was told by her husband, as she testified, "We have got home now; this is our home," and told her "to kneel down and thank her heavenly Father for a home." In view of this evidence, the conduct of William Adams towards the appellant is, to say the least, unkind and ungenerous. Such faithlessness. illy accords with the sentiments of honor, justice, and charity as entertained by the broad-breasted man of sin, however it may be regarded by pious moralists and religious zealots. But, notwithstanding, the case must be determined in accordance with principles of jurisprudence; the merits of the controversy have to be considered from a legal standpoint, and however much the court may be inclined

to condemn dissimulation and cruelty, it has no alternative except to administer the inflexible rules of the law. The statute provides that " an agreement made upon consideration of marriage other than mutual promise to marry is void, unless the same or some note or memorandum thereof expressing the consideration is in writing," etc. (Code, sec. 785, subd. 4.)

The agreement alleged in the complaint, that the respondent William Adams agreed with the appellant to give her the use of the premises for her home during her life in consideration of her marrying him, rests in parol; and if proved as alleged, I do not see how, in view of the statute, we could hold that it was valid. The appellant's counsel contends that it was . sufficiently performed to take the case out of the statute; but no performance is shown, aside from the fact that the parties actually intermarried, and cohabited as husband and wife, and that of itself is not sufficient.

We are not authorized to construe the statute as though it read in effect that an agreement made in consideration of marriage is void, unless the same is in writing, or *unless the parties actually consummate the marriage.* It was not intended to mean that; but was intended to mean that all antenuptial agreements concerning settlements, advances, and other pecuniary matters, made upon consideration of marriage, should be reduced to writing in some form, in order to prevent frauds and perjuries. A party has a right to interpose the statute as a defense in all such cases, unless he has given countenance to the performance of acts by the adverse party upon the faith of the agreement of such a nature that the latter would be materially injured if the agreement were not carried out. In the latter case, a court of equity, to avoid a fraudulent use being made of the statute, will enforce the performance of the agreement. But acts done prior

to the contract, acts merely preparatory or ancillary to the agreement, such as delivering abstracts of title, measuring the land, drawing up deeds, etc., marriage alone, payment of the price in whole or in part, do not constitute a part performance within the doctrine. (Pomeroy's Eq. Jur., sec. 1409, note 1.)

The appellant has not made any showing entitling her to the relief prayed for in her complaint. Her husband no doubt gave her to understand that he would furnish her a house and support her; he probably pictured to her, in glowing colors, a beautiful Eden, in which they would dwell and enjoy a continuous fruition of felicity; but the promised paradise proved to be the premises where the parties, after their marriage, took up their abode, and, after leading a cat-and-dog life for a couple of years, the said William, in order to eject the appellant therefrom, sold for three dollars, and the payment of some ancient debts, amounting, with thirty-five or forty years' interest added, according to his estimate, to about one thousand dollars, which, "feeling the uncertainty of life and strength in his old age," he became suddenly conscientious about paying. But that the parties entered into an agreement whereby the said William agreed to give the appellant the use of the premises for her home during her life, in consideration of her marrying him, is hardly sustained by the testimony. Nor is it shown that any such agreement was sufficiently performed to take the case out of the statute. She did nothing that I can discover, aside from the marrying, except to go and live upon the premises as William Adams's wife. The property was not set apart to her as a home, nor any intention shown to devote it to such use. Nor was William Adams guilty of any such fraud as would justify the enforcement of a specific performance of such an agreement. The course he pursued in making a sham sale of the premises in

order to evict his wife therefrom was vindictive and mean. The action to dispossess her was evidently instituted by his direction and for his benefit; and while she has no standing in court to question the transaction, yet I think he should be required to pay all the costs of the litigation. His attempt to turn his wife into the street, without food, raiment, or shelter, except such as she could provide for herself, very poorly comports with that vow he took at the marriage altar, before the same heavenly Father whom he told her to kneel down and thank for the beautiful home he is now nefariously scheming to expel her from.

The appellant's complaint herein will be dismissed upon the payment by the respondent of the costs as above suggested.